## HEAVY DAMAGES FOR INJURIES RECEIVED IN A COLLISION OF AUTOMOBILES.

Common Pleas Court of Cuyahoga County.

WILLIAM R. WALLIS v. EDWARD W. MOORE.

Decided, March 24, 1916.

*Negligence—Automobile Emerging from Side Street—Struck by a Rapidly Moving Machine on the Main Boulevard—Owner of the Car Which Was Struck Severely Injured and Heavy Damages Awarded —Rule of "Stop, Look and Listen" Not Applicable—Where Car Emerges from a Side Street Upon a Main Thoroughfare—Sanction of a Verdict on Third Trial—Competence of Evidence—Assumption by Counsel of Judicial Prerogative in Advising Witness.*

The law imposing upon one about to drive over a steam railroad cross-ing the duty to stop, look and listen, and the requirements as to care to be exercised by a traveler at a steam railroad crossing, as laid down in the case of *Railway Company* v. *Elliott*, 28 O. S., 340, do not apply, in the operation of automobiles upon our public high-ways, so as to require one driving an automobile upon a side street and intending to enter upon a main street to exercise such degree of care and circumspection, as a matter of law, with reference to automobiles which may be driven upon the main street.

*Thompson, Hine & Flory* and *Harry F. Payer*, for plaintiff.
*Tolles, Hogsett, Ginn & Morley, Seaton & Paine* and *Math-ews, Orgill & Maschke*, contra.

STEVENS, J.

This motion follows the third trial of this case. On the first and third trials verdicts were returned for the plaintiff, and on the second trial the jury disagreed. Each of the trials has taken approximately two weeks of the time of the court and jury.

While authority is available for the proposition that a second or third verdict for the same party adds special sanction to the conclusion of a jury, yet it would seem, upon principle, that error is none the less error because perchance it intervenes at a third trial. It is with this principle in mind that I have ad-dressed myself to a consideration of this case.

The following are grounds upon which defendant predicates his claim of right to a new trial:

It is claimed that the plaintiff's own testimony raises, as a matter of law, a presumption of contributory negligence, and that no testimony was offered to rebut that presumption; that the verdict was against the weight of the evidence; that the verdict is excessive and appears to have been rendered under the influence of passion and prejudice; that as to the exclusion of one item of evidence, there was error in the ruling of the court; that there was misconduct on the part of counsel for plaintiff, and that there is now available newly-discovered evidence.

All of the statutory grounds for new trial are set forth in the motion, but the above are the only ones relied upon in brief and argument.

I take up first the claimed error in the exclusion of testimony offered by defendant.

Defendant called as a witness Dr. W. E. Bruner, who testified that he had examined the eyes of the plaintiff on a day within the period of the present trial, and also in February of last year. He testified as to the condition of plaintiff's eyes at these times. He was then asked if he had examined W. R. Wallis' eyes before a year ago, and he answered, "I have examined a W. R. Wallis. Whether it was this same W. R. Wallis or not, I can not say. * * * These examinations were in 1902 and in 1907. * * * He was referred to me in the first examination by Mr. Harley Gibbs, and on the second examination by W. J. Davey." (It appears elsewhere in the record that Mr. Wallis and Mr. Gibbs had been friends, and that Mr. Davey was a clerk in the Hollenden Hotel, where Mr. Wallis was accustomed to stay when in Cleveland.)

Dr. Bruner was then asked by counsel for defendant if he was able to remember that plaintiff is the same W. R. Wallis that he examined on those two occasions, and he answered: "I do not remember that; I have no recollection of him, none whatever. I wouldn't have known it except that I found in the card index to my books the name W. R. Wallis and two other cards made out in the same name."

Upon the basis of this preliminary testimony, the witness was asked the following question:

"Now, I will ask you, what did you find the difficulty with Mr. W. R. Wallis' eyes on the first occasion of your examination and on the second occasion?"

An objection to this question was sustained, and upon this ruling by the court error is predicated.

I am unable to conceive any theory as to the evidential proprieties which would permit an answer to that question. There was a total failure and disclaimer of identification. The recollection of the witness was not in the faintest degree refreshed. The question did not propose an offer of the doctor's office index or record. Even had it done so, the matters sought to be elicited were not the recognized subjects of book account; and if the records were offered simply as records of past recollection, there was entire failure to lay foundation for such offer.

I do not feel that we need go exhaustively into a discussion of the propriety of this ruling. I will simply add that a careful search of the authorities on the subject of evidence has failed to reveal any principle or precedent which would justify the court in permitting the question to be answered.

The ground of newly-discovered evidence is urged. Waiving the criticism of failure to show that the matters set forth in the affidavits could not with reasonable diligence have been ascertained in time for use at the trial, an examination of these affidavits makes it manifest that their subject-matter is purely cumulative, and also of very limited range. No rule is more firmly established in our state than that newly-discovered evidence which is merely cumulative is not ground for a new trial. *Railway Company* v. *Long*, 24 O. S., 133; *Karlinger* v. *Brewing Co.*, Case No. 880 in our court of appeals, and cases cited in the court's opinion.

There is the further infirmity in the subject-matter of these affidavits, viz., that if the evidence offered at the trial, and upon which the verdict of the jury was presumably based, supported the verdict of the jury, this proffered newly-discovered evidence most certainly could not be said to require a different verdict.

This is vital. See *Railroad Company* v. *Long, supra; Traction Co.* v. *Fesler,* 12 C.C.(N.S.), 565; *Fritch* v. *Traction Co.,* 14 C.C.(N.S.), 79, affirmed without opinion, 88 O. S., 525.

On the matter of alleged misconduct of counsel, I will here confine my attention to a few instances which counsel for defendant regard as typical, and which are set out in the brief of counsel because doubtless they were regarded as the more flagrant instances of misconduct.

It is complained of counsel for plaintiff that he propounded questions which were leading, and that upon objection being sustained he questioned the witness with reference to the facts suggested by the leading question.

I have been at considerable pains, in reading the record of testimony in this case, to have this criticism in mind. I do not recall an instance in which the leading or suggestive question was directed toward any matter which was crucial or vital in the case. Indeed, I doubt whether error could have been properly claimed if the court, instead of sustaining the objection, had overruled it. Leading questions upon non-vital matters, or such as are preliminary, or by way of inducement, are not improper, and their allowance is within the discretion of the court. None of the questions objected to were of a character so doubtful as those considered by our Supreme Court in the case of *Evans* v. *State,* 24 O. S., 458 at 462. But the court, perhaps from a superabundance of caution, invariably sustained objections to such questions. If it be the law that an objection to a leading question having been sustained, that subject may not thereafter be inquired into without the intervening of error, it is safe to conclude that not one jury trial in a hundred would endure the test.

At page 51 of the brief of counsel for defendant, counsel for plaintiff is charged with misconduct in interrupting the cross-examination of one of plaintiff's witnesses by saying "the point is" and "watch his questions, Doctor." Mr. Hogsett was cross-examining the witness:

Question: "Did he (Mr. Wallis) tell you where the accident happened?"

Answer: "Well, I understood it was somewhere along on the boulevard. I don't know the exact location."

Here occurred the interruption by Mr. Payer. His remarks lacked completion as sentences, because they were broken into by objection by Mr. Hogsett and by the admonition of the court that there was no occasion for interruption. Mr. Payer's remarks, thus dissevered, were:

"The point is, Doctor  *  *  *  but he is answering one thing and  *  *  *  watch his questions, Doctor."

Such prejudice, if any, as might arise from this incident could come only from Mr. Payer's attempted assumption of the judicial prerogative of advising the witness that his answer was not responsive.

The only way in which a sound judgment can be reached as to the character and possible effect of these alleged matters of misconduct is by considering not only their text, but also their context. Any other method of considering them—any judgment pronounced upon them without considering the incidents which called them forth, or in many instances the colloquy with opposing counsel in which the remarks criticized were a part, would not be doing justice to the facts of the trial.

The trial, lasting as it did for two weeks, was, on the whole, conducted with decorum and with strict observance both of the spirit and of the letter of the law as to the introduction of evidence and the examination of witnesses. Objections to questions which had the slightest suggestive character were made and were sustained. The court frequently throughout the trial, and at all times when so requested by counsel for defendant, instructed the jury to disregard answers which had been ruled out, and to draw no inferences whatever from questions objection to which had been sustained.

I am firmly of the opinion that as to the claim of misconduct on the part of counsel or of witnesses for the prevailing party, no error has intervened to the prejudice of the rights of defendant.

Coming now to the question of negligence, it is urged that the testimony offered in behalf of plaintiff, and especially that of his chauffeur, Alex Herder, raises, as a matter of law, a presumption of contributory negligence, and that no evidence was offered to rebut that presumption. If that claim be not well

based, it is still urged that the verdict of the jury on the question of negligence was against the weight of the evidence. My conclusions upon these two claims, and my reasons for such conclusions, will be indicated in the one discussion of the whole matter of negligence which follows.

I have had some doubt of my right, under Section 11577 of the General Code, to consider the weight of the evidence. At the first trial of this case the jury returned a verdict for plaintiff. In defendant's motion for a new trial, filed at that time, a number of grounds were specified, and among them was the claim that the verdict was against the weight of the evidence. The journal and the court's trial calendar simply showed: "Motion for new trial granted." No ground was specified in journal or trial calendar. A stenographic report of the opinion of the trial judge at the time of granting the motion for a new trial shows that he used this language:

"Now the situation that results from that is simply this: Here is a record, to my mind, which does not disclose any error, unless it be that the verdict is against the weight of the testimony."

Although the facts surrounding the granting of the motion at a former trial are thus presented, I have decided to treat this case as though the matter of weight of evidence were still open to my consideration. It may be the law—I have not investigated the subject—that the known fact as to reason for granting the motion must be ignored when the reason has not been entered upon the journal of the court.

There is very little disagreement between plaintiff's and defendant's witnesses as to how the accident happened and as to the circumstances immediately preceding and accompanying its happening. The collision occurred in the day time on the main boulevard running east and west in Gordon Park, its easterly extension running toward Bratenahl, its westerly end crossing over Doan brook and thence to the boulevard running to the lake. It occurred just east of the bridge which crosses Doan brook. A small boulevard or roadway runs from the lake east of the brook and enters upon the main boulevard east of the bridge. At the corner to the left hand of one coming southerly

on the small roadway toward the main boulevard was a clump
of shrubbery concealing the view easterly on the main boule-
vard. The main boulevard is thirty feet wide from curb line
to curb line, but wider where the small road enters it. The lay-
out of the roads, so far as all essentials are concerned, is analo-
gous to the situation, say, at Euclid avenue and East 79th
street, having in mind the buildings at the northeast corner of
East 79th street. One driving south on East 79th street toward
Euclid avenue, and one driving down town on Euclid avenue
and approaching East 79th street, would be in the same situa-
tion relatively as were Wallis and Moore at the time in question,
with the exception that from the corner of East 79th street one
can see farther east than he could from the corner of the small
road in Gordon Park. Wallis' automobile emerged from the
small road going slowly, some witnesses say very slowly. Wit-
nesses for both plaintiff and defendant agree upon that. The
driver was intending to make a left-hand turn and go east-
wardly toward Bratenahl. His car slowly crossed the road. Its
hind wheels were over or beyond the center of the road and
its front wheels were within two or three feet of the south curb
when it was struck by the Moore car on the south side of the
road, that is, on the left side of the road with reference to
Moore's car. Witnesses for both plaintiff and defendant are
agreed as to all that. The surface of the road was macadam, and
it was dry and somewhat down grade. Officer Zuerl, produced
as a witness by defendant, examined the cars and surroundings
shortly after the accident. He testified, in response to a ques-
tion by defendant's counsel, that the roadway showed that the
Moore car had slid or skidded for some twenty-five or thirty
feet before striking the Wallis car. As to all of these physical or
mechanical facts which I have recited, all witnesses agree, or
they were testified to by defendant's witnesses.

The testimony is conflicting as to the distance eastwardly
which a car on the main drive could be seen by one emerging
from the small drive, the testimony on this subject giving esti-
mates varying from 150 feet to 400 feet and as high as 520 feet.
The length of view is varied to some extent according to the
precise position of the observer after emerging from the small
drive. A consideration of the maps and photographs, and of

the oral testimony is quite persuasive to the effect that the estimates of greater distance of view were the more accurate. Testimony also conflicts to some extent as to the speed at which the Moore car was being driven at the time. Plaintiff's witnesses place it at thirty-five or more miles per hour. Robertson, driver for Moore, is of opinion that he was driving "about fifteen miles" per hour, but concedes that it might have been slightly more than that. Testimony was given as to the distance within which a car going at various speeds may be stopped. The testimony of Traffic Officer Zuerl, that the wheels of the Moore car slid for twenty-five or thirty feet, has relevancy on the matter of speed.

Testimony also conflicts as to the position of the Moore car in the road when first seen, some witnesses saying it was in the center, and witnesses for the defendant saying that it was on the right side of the road.

Plaintiff's witnesses testify that the Moore car was 150 or 200 feet distant when they first saw it, and that the Wallis car was then at the center of the main road. Moore's driver, Robertson, says that when he first saw the Wallis car he was about forty feet distant from it, was on the right side of the road, and that the Wallis car was just coming out from behind the bushes.

It is contended by counsel for defendant that the testimony given on behalf of plaintiff, and especially that given by Alex Herder, driver for Wallis, brings this case squarely within the doctrine of *Railway Co.* v. *Elliott*, 28 O. S., 340. This doctrine being deemed by counsel to have application, it is urged that the undisputed testimony shows that if Herder had looked he could have seen, and that he can not be heard to say that he could not see what could be seen "by one in the full possession of his faculties," exercising them with ordinary care.

To apply the doctrine of the Elliott case to the operation of automobiles upon our highways would necessitate a holding that one driving from a side street into a main highway subjects himself to the rigorous requirements as to care which are imposed upon one who drives across the right-of-way of a steam railroad. He must stop, look and listen. If he desires to cross the main highway he can not be permitted to assume that an approaching automobile will slow down to permit him to cross if he is first

to arrive at the crossing, or that it will operate at the speed prescribed by law. This is undoubtedly not the law governing one about·to drive a horse and wagon across a street railway track. If this case were one between the driver of a horse and wagon and a street railway company, and all the testimony and circumstances were presented as they are here presented, there could be no serious debate upon the proposition that the case was one for the jury. The case of *Traction Company* v. *Brandon,* 87 O. S., 187, definitely establishes that proposition. In the opinion in that case Judge Spear, in considering the obligation to look and listen at steam railroad crossings, says:

"Nor would a failure be regarded as negligence if under all the circumstances a person of ordinary prudence would be justified in omitting to use them (his faculties), the question of negligence and contributory negligence being a mixed question of law and fact to be decided by the jury, unless the circumstances of the case admit of no rational inference but that of negligence, * * * for a much stronger reason it is the rule as to crossing a street railway track."

It is difficult to conceive any basis in reason for a holding which would impose upon the driver of an automobile a duty of care, with reference to the driver of another automobile, greater than the duty of the driver of a horse approaching a street railway track, and as great as could be argued for the most strict application of the principles of the Elliott case and of the case of *Railroad Company* v. *Crawford,* 24 O. S., 631.

I am constrained to hold that the doctrine as to steam railroad crossngs does not apply to this case.

Giving to the Moore car the right of way, and assuming as true what Herder denies, that when he emerged from the small drive he did not look or, if he did look, that he saw the Moore car some distance up the road to the east, what situation is presented as regards a jury's consideration of the case?

Wallis' car had passed beyond the center of the road. It was struck on the south side of the road, that is, the Moore car was on the left side of the road when it struck the Wallis car. If Herder had looked and had calculated, he could not have calculated more accurately with respect to his car than subsequent events indicated, viz., that he would have time to pass

over the center of the main road and reach its south side. This he did. A right of way for a driver does not include an exclusive right to the whole of the road. It includes in its most generous recognition the right to pass unobstructed and unretarded along the proper side of the highway. The mechanical and undisputed facts as to the collision were before the jury. With such a presentment, the least that can be said is, that the undisputed facts presented a situation as to negligence upon which reasonable minds might honestly differ, and as to which there might well be an earnest conflict of serious opinion. If the jury is to try the facts, few cases present more typical instances of matters which the law says belong to the province of the jury. I am convinced that for a judge to intervene and overturn the findings of the jury on the subject of negligence as here presented would be a clear and unwarranted usurpation of authority.

The jury returned a verdict of $55,000. It is urged that the amount is so large as to indicate passion and prejudice. Passion or prejudice is not claimed to have appeared in any way other than in the amount of the verdict.

The character and appearance of the jury in this case were the subjects of favorable comment by counsel on both sides. As jurors, they appeared to be men of unusual intelligence. They were from various walks of life. Some of them were men of trained minds and occupying fairly responsible positions in the community.

The condition of the plaintiff, both before and after the injury, was testified to by many witnesses. Some of these witnesses were persons of much education, experience and skill. They had the appearance of entirely reputable persons. The claims of plaintiff were thus apparently exceedingly well fortified. Their testimony can be disregarded only upon the assumption that there existed among all of the witnesses a most extraordinary concert of purpose to deceive.

The plaintiff was shown to have had, prior to the collision, earnings of about $15,000 per year through his personal activities. At the time of receiving his injuries he was about 43 years of age. Much testimony was adduced to support the claim that since the time of the collision he has been insane and mentally

and nervously wholly incapacitated from following his vocation. From the time of the collision to the time of the trial about three and one-half years had elapsed. The jury was instructed on the matter of measure of damage that it might take into consideration loss of earnings directly resulting from the injury. It requires, therefore, no ingenuity of analysis to apprehend an explanation for the amount of the verdict, both rational and unquestionably lawful.

Exercising, perhaps to the extreme, a prerogative which has the sanction and approval of our Supreme Court, I have exacted from the plaintiff a remittitur of $15,000 from the amount of the verdict. This I have done with the thought in mind that the net result of trial in this court should be such as to convince disinterested judgment that the rights of defendant had been safeguarded to the utmost. Further than this I can not go. A jury's verdict is not sacred, but when a trial has been conducted with such regard for the rules of evidence and procedure as characterized this trial, when every request made by defendant for instructions to the jury and as to contents of the charge of the court has been granted; when no error has been claimed in the charge of the court; when the verdict of the jury finds such ample basis and explanation in the law and in the evidence received—to set aside this verdict and to grant a new trial would, I believe, be an inexcusable trespass upon the right of trial by jury, a right jealously safeguarded by our laws.

The plaintiff having consented to a remittitur of all of the verdict in excess of $40,000, the motion for a new trial is overruled, and exceptions by the defendant are noted.